Friends of Animals v. Fish and Wildlife Service, 25-402-1. Good morning, Your Honors. May it please the Court, my name is Andrea Mercuccio and I represent Appellant Friends of Animals. I'd like to reserve two minutes for rebuttal. This case is about a conservation plan that conserves almost nothing. It prioritizes development at the expense of a species threatened with extinction. The U.S. Fish and Wildlife Service issued master incidental take permits based on a general conservation plan that lets the counties approve future development that will permanently destroy habitat across the Utah Prairie Dogs' entire range and take over 7,000 individuals, all without identifying a single colony or an acre of habitat that it plans to protect. Today, I'll focus on two critical ways that decision violates the Endangered Species Act. First, it was irrational for FWS to conclude that the mitigation or that the harm would be fully offset without assessing the biological value of what will be lost versus gained and instead relied on so-called mitigation that kills more than 90% of the animals involved. And second, it failed to require known practical mitigation that would reduce take. And if I have time, I'll also address how the record directly contradicts the no jeopardy finding and the funding finding. For these reasons, we respectfully ask the court to vacate FWS's arbitrary decision. So moving to the first issue, the Endangered Species Act requires that the counties minimize and mitigate mitigated impacts to the maximum extent practical. But only if it's the oh, but that's only if the take is not fully offset by mitigation measures, right? Yes. Under the handbook. Yes, your honor. So they're based on the handbook. There's two ways that they can do that. Either find that it's fully offset or they can find that no more practical mitigation would reduce take. So here, FWS claims it met that requirement by finding that the impacts are fully offset. So if the court rejects that finding, then it violated the ESA. And there are two major problems with that finding. And it's first is that they couldn't reasonably conclude the impacts would be fully offset without looking at the biological value of what would be lost and what would replace it. The recovery plan repeatedly emphasizes that Utah prairie dogs can only survive and recover if FWS identifies and protects valuable habitat that keeps colonies connected, especially on non-federal land. It explicitly directs conservation plans to do that. And FWS's handbook confirms this by defining fully offset to mean that the biological value lost must be fully replaced by conservation measures with equal biological value. One thing I don't didn't understand from the materials. Let's say I'm in Iron County and I want to open up the Bob Baccarat condominiums on on a major development area. And so Iron County has this now that is this master permit. And so I send an application. I send a biological map. I say exactly what I want to do. Now, does Iron County then determine whether or not there are adequate mitigation measures to fully offset the the the permanent destruction of habitat that's going to happen through the Bob Baccarat condominiums? Your Honor, so under these type of master permits, there is for in major development area, no habitat quality assessment is needed before take occurs. And in minor development areas, they do require a habitat quality assessment. But that's only used to rate the habitat. And it's just kind of to track the mitigation success of the GCP. But then why are the applicants for these developments submitting these applications for a certificate of inclusion or if there's not a master permit for an incidental take permit? You know, with all of this information about the biological habitat that's going to be destroyed now, they say, well, that's that, you know, that that I think they wouldn't they imply is that it's going to take place later. The comparison between the biological habitat that's permanently destroyed versus the habitat that's going to be available on federal lands, for example, through through a trans relocation and the like. So so are you saying that despite the fact that an applicant for a certificate of inclusion or for ITP submits this material that nobody ever actually looks at it? They give you a certificate of inclusion and then worry about what they're going to do later? Yes, Your Honor. In for major development areas, there is no habitat quality assessment done. They might say where their location is, but there's no assessment of the biological value of the colonies and habitat in that area. And that is described on 3JA 211 and 220. And so the counties won't ever know what that quality is that's being lost. And they do require them for minor development areas. But again, the UDNWR looks at these assessments, not Fish and Wildlife Service, and they just report it to Fish and Wildlife Service. It says that they it is only to track mitigation and not to change any mitigation here. So under this plan, the mitigation is already set by the GCP. There is no more additional mitigation that will be changed in the future. It's just the kind of structure of this is that the mitigation is already fully offset now. And all that the developers have to do is basically just apply for the certificate of service. They just have to say that they're going to comply with the GCP, which is just to translocate if feasible, and they pay their fees. There's not any more habitat quality analysis done. Council, can I pick up on a word you just used, which is the structure of all of this, because you're not challenging, as I read it, individual permit request decisions that are made by the master permit holders. You're challenging the general conservation plan, which Fish and Wildlife said is more at a landscape level. And as I read the district court's order, it kind of took you to task to say, well, you're not understanding that this is at a landscape level, the conservation plan. And so all this information that may be deemed deficient, of course, they wouldn't know that when they authored this plan because it has to be decided later. And so I just find myself struggling to understand how that makes a difference to our analysis here when, as I read the requirements of the statute, it doesn't really contemplate, as I read it, a difference between these general conservation plans and the habitat conservation plans. Yet in your reply brief, you said, well, we have no issue with them doing it this way. Your Honor, so we aren't challenging the programmatic structure of the general conservation plans, but this GCP was FWS's one and only chance to assess the biological value and the impacts and implement more mitigation before these colonies are permanently destroyed. Under the ESA, anyone applying for an incidental take permit must submit a conservation plan, and FWS has to make these findings about it. Under these master permits, like this general conservation plan is the conservation plan for that. It could not have been, the permits could not have been approved without it. And FWS will not review or approve any future development. There is some reports after the fact, but that is after HABT has already been taken. They just say that they treat all allowed take under these certificates as already fully mitigated and already addressed by the original GCP, the original NEPA analysis, and the no jeopardy finding. There is not further review, and I do believe that that is where the District Court misread those facts. So there's never a biological review? Is that what you're saying? Not by Fish and Wildlife Service, no. And you're saying that by the terms of their own handbook, that's required? Yes, Your Honor. Pre-permit? I mean, you say you're not challenging the structural or the programmatic aspect of this, but it seems like you are. In the sense that you suggest that this needs to be before the issuance of the permit. But, Your Honor, the permits are already issued. These master permits are incidental take permits under the Endangered Species Act. Right. And you're not challenging the fact that those master permits are issued? You're not challenging the structure of that? Your Honor, we are. It seems like you are, and that's why I kind of thought maybe Judge Federico was going there too. That's my struggle as I was reading the briefs, is you insist that you're not challenging it, but then you seem to be challenging it. Your Honor, we are challenging the master permits. We are not challenging future certificates of inclusion that the counties will eventually approve. So your position, as I just, I think, heard you articulate it, is that Fish and Wildlife Service has to make these determinations about, you know, whether or not these master permits, as they are being given out to counties, comply with the requirements of their plan and therefore the statute. But again, I think the district court says, well, how could they at that point in time, because they don't even know what the projects are, where they're located, and what the potential take and mitigation would be. Well, Your Honor, there's ways to mitigate the impacts to the maximum extent practical without knowing the location. That is why biologically based mitigation was required here. The recovery plan directs them to protect valuable habitat, and they could have mapped out all the habitat and said, no development in this area. And then they would know that the biological value of what's being taken isn't high quality and important for recovery and survival. And consistent with its own handbook, it could have said that, it could have replaced with either more or better quality habitat. It chose not to. It instead just labeled the areas as major and minor development areas and used this mitigation ratio of conserving one acre of habitat for one loss. But that tells you nothing about the biological value of that habitat. And its handbook has many examples where they will say, if this quality of habitat is lost, it must be replaced with this quality of habitat. And none of that happens here. There were just so many ways that they could have protected valuable habitat and still comply with the statute, but they did not do here. And complied with the programmatic structure that they've set up here? Yes, Your Honor. Okay. And they would have done that pre-permit. Yes. And that would be by implementing this mitigation that does consider these biological values of colonies and habitat, like exactly what its recovery plan tells it to do. And instead, they just relied on these translocations that are overwhelmingly unsuccessful. FWS itself said 90% of prey dogs will die within a year and two-thirds of sites will completely fail. That means that the mitigation itself results in takes. So there's no way that these impacts could have been fully offset. And its own handbook says that translocation should be used sparingly and only with further research. And the record confirms that the new colonies that will be created through these won't fully offset the loss because the GCP deems translocation sites successful even if all prairie dogs die on two-thirds of the sites and the remaining one-third have a spring count of just one prairie dog. But the science shows that to maintain viable colonies and that the colonies need to remain connected and have a spring count of at least 20 prairie dogs. Otherwise, they contribute little to the species' long-term persistence. And I see... Counselor, can I ask you one quick question on remedy? You're arguing for us to vacate the plan, but if we found that there was, you know, maybe problems with the plan, why would we not remand for a vacature decision by the district court? Your Honor, the court should vacate and remand the GCP and permits because this is the presumptive remedy under, for violation of the APA. And there's no reason to depart from that rule here. These are seriously serious and not easily fixed issues and if there are any questions on remedy, we would request some further briefing on that. And I see that I am cutting in my rebuttal time, so... Robert, why don't you stop the clock. Rich, did you have any questions? No? No. Thank you. Thank you. Good morning, Your Honors. Amy Collier on behalf of the U.S. Fish and Wildlife Service. I'd like to start by addressing a little bit of misconception, I think, between the mitigation with the major development and what the agency is considering there and the mitigation for the minor development areas. So, Fish and Wildlife first looked at the entire mapped entire range. And you can look at those maps. I don't have the site in front of me, but I think it's 3JA 121, 122. Looked at the maps, looked at the areas where there is already development or areas adjacent to developed areas that Fish and Wildlife determined there might be prairie dogs, but those prairie dogs aren't important to the long-term survival of the species in those locations where they are now. Right. Because, I think you say it on 59, because these are built-out areas or adjacent areas that are going to be built out, which sounds like the prototypical definition of a circular area. Well, I see that there's planned development there, but it's also areas that are already developed, that the habitat is fragmented, that there isn't that connectivity that you might find in the minor development areas or the less developed areas. So, you have these sort of isolated prairie dog populations. Right. But, at least as far as the areas that are not yet built out, that argument is circular. Would you... Sorry, I missed what you... For the areas that are major development areas that are not already built out in a condominiums or into an existing development, your argument is circular, right? Well, no, I don't think so, Your Honor, because I think in the places where they're adjacent, and you can look at the maps, you can look at where they designated these major development areas, those places, if there are colonies there, they are isolated from the greater meta-population as it stands. But, you also are saying in the GCP that the major development areas are the ideal site for the colonies because the federal lands are arid, and these major development, if you want me to find it, I will, but the major development areas are areas with prime vegetation, they have lots of moisture sources. And so, explain to me how it's not circular to say, because we're going to build, because we're going to give these faster permits and these are going to be able to take these, how is that not circular? So, I think the distinction there is it's not the major development areas that have the good habitat, it's the minor development areas, private land, still non-federal land, that might be more agricultural, might have more moisture, might have lower vegetation because they have those agricultural practices. Those areas might serve as good habitat long-term. And that's why the agency looked at those areas and determined that, you know, for development that happens in minor development areas, we're going to offset that by protecting in perpetuity land that's private land elsewhere at a greater than one-to-one mitigation ratio. All right. So, which of the sites for the major development area in the federal sites, which of those are, or could you tell me where in the GCP or in the findings or the biological opinion, FWS ever says, this is a good area to put 400 Utah prairie dogs on? Which of the areas in the major development or... In federal land, for either a minor development area or a major development area for your mitigation of translocation, where have you ever said, this is a good site to create a new, you say you're going to create three new colonies, where? Sure. So, they discussed the conservation banks. It identifies three specific conservation banks that have up to 311 acres potentially for offsetting impacts elsewhere. And that's in the GCP? Yes, that's a 3JA62. In terms of federal land, it talks throughout the GCP. And I apologize for not having a second. Where on page 62 does it tell me, this is the location that we're going to create these new colonies on federal land? Okay, so that's the conservation bank. That's protected land, but not federal land. I don't have the site in front of me where it tells you the specific areas of federal land where the translocation colonies would appear. But they have been maintaining translocation sites on federal land for decades. They've been adding prairie dogs to those. They've been both creating new ones, but then also ones that have been depleted, adding prairie dogs back to those sites. And you're saying that, I think it's on table 11, that you're going to, I think it's 1,714 prairie dogs, Utah prairie dogs on these sites that are going to be translocated. And you're going to take this figure out of those three years of iron counting. You're going to say 71 percent of that 1,714 prairie dogs are going to be translocated. And we're going to step that up with a multiplier of five. So we're going to have like 6,000 prairie dogs. Why is that wrong? I don't, so the... How many prairie dogs are you going to trans relocate? The stepped up estimate estimates that over the course of 10 years, 5,466 prairie dogs will be translocated. All right. And so have you ever said, where are these prairie, other than saying, I'm going to put, trust me, we'll find federal land that has great vegetation, that's got great liquid sources for these prairie dogs. Where have you ever said that there are enough sites, would you say 5,000? 5,000 over the course of the entire 10 years. In 10 years. 500-ish a year under the stepped up. And you can't put more than 400 prairie dogs in a colony, right? Right. So where have you ever said in the next 12 years, we have 12 sites on federal land that we can put, that we can move these 5,000 plus prairie dogs? From a biological perspective will be equivalent. So I think we need to step back again and look at the framework that the Fish and Wildlife Service is dealing with here. Again, this is the maximum potential amount of prairie dogs that would be moved. Under the expected amount, it's much lower. And Fish and Wildlife left that analysis in there to sort of give a better understanding of what they expect they will actually accomplish over the course of the year. Okay.  Well, so the five times the stepped up and down is, we were kidding, you know? It's not that we were kidding. That is the maximum amount of take that could happen over the course of 10 years. That's what you expected. That's what the GCP said. That's not what's expected. That's the maximum cap on take. Okay. So you have the maximum cap of 5,000, I'm not trying to argue it, but you're saying that the maximum is we're going to have over 5,000 prairie dogs that we have authorized. If Friends of Animals wants to come in eight years later, you're SOL. We have authorized now in this GCP the transfer relocation of up to over 5,000 prairie dogs. And so I'm not asking a terribly complicated question. I'm just saying, where are you going to put these 5,000 prairie dogs? So I would direct the court's attention just towards the discussion of how the agency selects translocation sites, the history of setting up translocation sites, and the improved success. So that's at 560, sorry, 3JA67 is where they're discussing about how they've used the sites. It also discusses... So, I mean, you've got all sorts of stuff about how you're going to do this. That's, you know, if you don't have an answer to my question, I'm trying to be argumentative. But see, and you can defend saying, well, we hadn't done it. But I'm just trying to know, are they right or wrong when they say that Fish and Wildlife Service has never said that we have one, two, three, four, 12 sites that we can trans-relocate 400 prairie dogs? I think that is factored into the analysis of the agency determining that there would be 71% translocated, that there would be new colonies of 400 acres and three new colonies of 400 acres on the stepped up. The point that the analysis here, of course, is at a general level. Judge Morris. Well, just, can I just, I think you're not addressing what I think the problem is. It's not about the numbers that you came up with. Here's how many will be transferred. Here's the maximum take. It's about the quality of the assessment, especially as to mitigation. You know, there has been no biological determination of the quality of these colonies, the numbers of top, because you don't know. For the translocated from major development areas or for minor development areas? Yes, for mitigation for major development areas, the plan creates new colonies on a one-to-one level on protected lands. But you don't know what the quality will be. But Fish and Wildlife already determined that the major development areas don't have quality that is important, habitat quality that's important to the long-term survival of the species. Where did you say that? Now, you have said that the major development areas are not a long-term source that is viable, I think it was old 59, because. Of development. We're going to expect a lot of development. And because there's already development there. There's nowhere in the, yeah, right. Where do you actually look at the biological aspects of the colonies that are in the major development areas? So I think to step back a little bit, Fish and Wildlife applied two different offset ratios for the major development and minor development areas. For major development areas, the agency realized we're replacing occupied habitat in these major development built-out areas that aren't important to the long-term survival of the species with occupied habitat that wasn't previously occupied habitat, but newly occupied habitat on a one-to-one ratio on federal or protected lands. That they determined was a biologically offset. Again, applying their expertise. What is the quality of the newly occupied habitat? The fact that it's protected in perpetuity, that the agency will also. I'm talking about the biological. Sure. So the translocation program, and if you look at the various provisions that are required as part of the translocation program, involves a ton of money that is spent. I'm not talking about the money that's spent. No, no, no, but that's important. I'm not talking about the funding. I'm talking about what you know ahead of time about these areas. These sites are treated for plague. They have vegetation treatments. They apply these aspects to these particular translocation sites to improve the habitat. So it doesn't matter. What you're saying is it makes no difference what the size of the colony is. It makes no difference what the quality of the colony that will be transitioned is. You're going to make sure that the mitigation area is sufficient. I think the size does matter. They've measured out the 400 acres. That's the size that the goal for the translocated colony is. They determine that we're going to be applying these particular measures to improve the habitat quality, to make sure it's sustainable for the species. We don't know where it is right now. But we don't need to know yet where it is. That's sort of the overarching... You'll make it just exactly what it needs to be. Well, again, I don't know who you'll make it, who that's applying to. If Fish and Wildlife is not... Well, you said it will fully offset. That's the choice of the agency.  The biological determination... Mitigation will fully offset. Offsetting a colony or fragmented habitat on major development areas with a sustaining colony of 400 acres on protected land that will be protected in perpetuity and will be treated with various treatments to improve the habitat quality. Take into consideration things like connectivity with other colonies. Take into consideration the size of that colony, how close it is to other smaller colonies. That's all that's going to be factored in. And I'd like to push back a little bit on the fact that Fish and Wildlife is having no role going forward once it issues these permits. At page 3JA61, it talks about how the Fish and Wildlife and the Utah Department of Wildlife Resources will together evaluate habitat quality for mitigation, will determine the offset ratio that's appropriate for minor development areas. Okay, so can I ask you the same question that I asked Friends of the Animals, and that is, does Fish and Wildlife or the Utah Department of Wildlife Resources, is there any analysis of comparing the biological habitats of the sites that are destroyed versus replaced prior to the issuance of a Certificate of Inclusion? Yes. So where do I find that in the GCP? So the permit process and requirements is at 3JA204. That's where it starts. And it details how a permittee will apply for a Certificate of Inclusion from the county or the master permittee, whoever that is. They have to first do, if they're in the clearance area for, basically if it overlaps with habitat, prairie dog habitat, whether occupied or not, or within the clearance area, they have to do a survey to determine if there are any, have a qualified biologist do a survey to determine if there are any prairie dogs even present. If there are ones present, then they also have a biologist do a habitat quality assessment. I've seen that on 204. I just, what I don't see, and maybe I'm just overlooking it, is where, you know, this provision, 1.0 Master Permit Holder Process, ever says that the Utah Department of Division of Wildlife Resources ever does a comparison after they get all of this biological data to make sure that there's full offset. Let's say on Bob Bacharach's condominiums. Yeah. I just don't see that on page 204, 205. There's annual reporting that the State Department does. They gather all the information about the location, size, quality. But that's not prior to the, that question is about prior to the Certificate of Inclusion. Now, if you're talking about annual monitoring, I just, you know, you've got a lot of stuff about annual monitoring. Yes. I just want to know, prior to the issuance of a Certificate of Inclusion, where does it say on 204 and 205 that the Utah Department of Wildlife, Division of Wildlife Resources is going to do this comparison of biological habitats prior to the issuance of a Certificate of Inclusion? So that is, I don't know if it says it on those pages, but it does say it when it talked on 3J61, where Fish and Wildlife and Utah Department are making the, making sort of the determination of what would the offset ratio for that particular project would be. Now, I acknowledge there's a fair amount of flexibility in here. That's the design of the plan itself, which I understand plaintiffs not to be challenging. The benefit of this program here is that it has that flexibility. It's on a bigger scale so that the agency can look at, you know, both project by project, but then with that annual monitoring, that three-year monitoring, determine whether check in, see if the measures have been fully, the mitigation is fully working, see if it's been effective. And if it's not being effective, are there things we can do with raising the fees to get more money to buy better habitat quality, quality habitat to offset these losses? But there's sort of that continuing on check-in process. So it might not be immediately the second that the certificate of inclusion is issued, but there's this ongoing process to make sure that the take that's occurring is fully offset through these other provisions. And I know I'm out of time. I just wanted to ask, because I just feel like I'm missing this, but what's the justification for requiring a habitat quality assessment for minor development areas, but not major development areas? So again, that goes to Fish and Wildlife's expertise, determining, looking at this species and saying, this is not, and this isn't a recovery plan, that these areas are not important to the long-term survival of the species. The mitigation measure there is not to replace that lost habitat with habitat of a particular quality. So we don't need to know the particular quality that's being replaced. The mitigation there is to create new colonies in places where there hadn't been colonies to fully offset the take of colonies on major development land. And this, again, goes to a point that these are the experts supplying their expertise. Weighing biological value is something that the agency does every day. And I think, you know, sometimes as laypeople, we don't necessarily understand that balance, but they do. And they've been managing this species for decades and decades, and it's continued to improve over the course of that time with habitat conservation plans in place. I'm sorry, one more as well. As I understand, you know, the fully offset route that the agency has determined to take, how do you compare full offset to what I think I read was how you were going to define translocation success? Meaning there was this objective to translocate 120 to median to large colonies onto federal lands, but then the estimate, again, maybe I have this off, but was that maybe only three small colonies would actually get translocated successfully in 10 years? So how do I look at the goal of full offset compared with that estimate of what is defined as success and find those two concepts to be in alignment? So I'm not sure the numbers are quite right. My understanding is that the mitigation for major development areas is to create occupied habitat of under the stepped up estimate would be 1,200 acres, which would offset the 1,100 or so acres of major development, of habitat destruction through development in major development areas. So it'd be greater than that 1,100 amount. So the full offset you're measuring in acreage, not dogs. Yes, and I think that that's what the agency has explained throughout the recovery plan and with this as well, is that this is a species that has a very short life cycle. It's measured success is often based on the extent of its habitat because there is quite this bit of turnover and quite this bit of fluctuation from year to year. The agency pointed out that the annual fluctuations in population for the species can be huge. And so how they really measure it is the extent of occupied habitat. And I think, again, it's within the agency's expertise to determine that that is an appropriate measure for the biological value for offsetting. And I would like to touch really briefly on the vacater question. I certainly don't think vacater is warranted here. If the court does go that way, we would absolutely request that it be remanded to the district court. This plan has been in place for almost eight years now. It's a 10 year plan. And I know it's on the record, but the species is doing incredibly well with this plan in place, and it would be incredibly disruptive to vacate this plan and take it out in that sense. And I think that is all I have. Is there any further questions? So I'm hesitant to ask this because nobody's talked about it, but I do have a question about the funding. And I want to tie it back to something you said earlier. So my memory is on page 182 of the GCP that you, not you personally, but your client, has calculated the trade relocation cost per Utah prairie dog at $272 per prairie dog. That's based on $408,000 that you say is just a starting point for relocating 1,500 prairie dogs, right? That sounds right to me. And so if you take this stepped up estimate that you've authorized, but don't really anticipate that you've authorized it, over 10 years, of 5,000 plus prairie dogs being trans-relocated, how can we say it's not arbitrary and capricious to say, I mean, that's a big number. 5,000 times 272. In other words, even if you take that $408,000 and triple it, that's over a million dollars. And OK, fine. The Utah has said, well, we'll provide funding as available. But they've never provided over a million dollars. So even over a number of years, have they? At least... Not in the record. We're limited. Yeah. Well, that's what we're confined to. But that analysis, again, was looking at the annual cost. And it said that the annual cost would be, I don't have the number in front of me, but less than what the Utah Department has contributed annually for the last several years. Utah has been doing translocations for 50 years, I think, in this area. And the annual cost would be less than what they've been contributing. Your whole point, however, is... I mean, this is why you're using the Iron County years for 1998, 2000, and 2001. This is unprecedented, is your argument, as far as the new emphasis that was not available to Iron County in the late 1990s and early 2000s. That's your point, right? That this is an unprecedented shift in trans relocation. And so, how can you say, okay, well, even though we have never experienced this sort of emphasis on trans relocation, they provided $340,000 a couple of years ago. And so, we can kind of guess that over 10 years, they'll probably be willing to provide us over a million bucks. So, just to clarify, Utah does... And the federal agencies do translocations independent of development. And they've been doing that for many years as well. So, I think that factored into the cost analysis, too. That the department is committing this money for translocation as a minimization and mitigation measures in this plan. And over the last several years, they've contributed way more than that to translocations generally for the Utah. They do that over a million? Yeah. Well, I don't know per year over a million, but certainly, cumulatively over a million. And if we look in the GCP, we'll find that. Yeah. There's analysis of how much the state has been contributing to translocations generally independent of habitat conservation plans. But I would also point out, too, that if it turns out that there's shortfalls in any funding with translocations, the agency is continually reviewing the funding from the mitigation measure for minor development areas and whether that standard fee is sufficient. And there's room there to increase that standard fee if we need to adjust the funding across the... That only goes towards the future developer, not your past developer. It does, but it... That presumes there is future development, right? I think that's a reasonable assumption to make here. I don't think it's unreasonable for the agency to believe that there will continue to be development over this 30-year build out for this area. But that adjustment to funding does explicitly say it'll account for any shortfalls in previous years, too. Thank you. So there's a couple of points I'd like to address. And the first is that if the Fish and Wildlife Service never knows what the quality of habitat or colonies lost is, how will they ever be able to determine that this would be fully replaced? And on 3JA211, the first sentence says, habitat quality assessments are not required for projects that occur in Utah prairie dog habitats in the major development areas. That is where FWS estimates 90% of the take will occur. And to mitigate that, they will be translocating prairie dogs at a one-to-one ratio of unknown habitat quality to areas where they have specifically said are arid and there's competing uses and they have not said that there's high-quality habitat available there. What about the response that they're going to make sure that they can turn this into high quality? Low quality can be turned into high quality. Your Honor, the Fish and Wildlife Service was supposed to make this finding before it issued the permits. It cannot rely on uncertain, maybe we'll make a good habitat quality in the future. To make that fully offset finding, it had to know, do some type of biological mitigation in advance here. And not only is the, sorry, I see him running. So not only is their interpretation of major development areas circular, it is also the recovery plan specifically says that these areas remain critical to survival and recovery. Its own document says until recovery is achieved, major development areas, quote, retain a high level of conservation value, unquote, because they maintain many prairie dogs and maintain connectivity with minor development areas. So when 90% of the take is being done there and they're not even assessing what habitat is lost, then there's no way to say that it's going to be fully offset. And these areas contain 46, the major development areas contain 46 medium and large colonies and 5,200 acres on private land. And these are areas that the recovery plans have said are essential to survival. But counsel, why should this court substitute our judgment for Fish and Wildlife's expertise when they just argued that major development areas are not important to the long-term survival of the species? And that's their agency expert opinion. Why should we defer to that? Your Honor, this is not deferring to a different scientific opinion. This is just saying that they can't reasonably find that the impacts are fully offset when they haven't assessed the biological value here. And even like deference isn't unlimited. They still have to ensure the scientific integrity of their analysis. And they have not done so here. And the habitat quality assessments that opposing counsel was talking about only apply in minor development areas. That page 61 is talking about conservation links, which are used to replace habitat in minor development areas only where 10% of the take will occur. And even then, there's only 311 acres of or less available in those conservation banks. So there's no there's no there's no reasonable basis to conclude these would be fully offset. And if there are no further questions. All right, thank you. I don't think we do. Thank you both counsel. Obviously, as all cases are very important. And I appreciate the excellent advocacy of both sides.